UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MATTHEW PEREZ,

                        Plaintiff,

                        08 Civ. 9669 (PGG)

       vs.                   FIRST AMENDED
                                          COMPLAINT AND
                                          JURY DEMAND

CITY OF NEW YORK, Commissioner of the
New York City Department of Corrections (DOC)    ECF CASE
MARTIN F. HORN; DOC Chief of Department
CAROLYN THOMAS; DOC Deputy Commissioner
RICHARD R. WHITE; DOC Warden at Robert N.
Davoren Complex ("RNDC") GREGORY
MCLAUGHLIN; DOC CAPTAIN KELLY
(a skin bald African-American man known by
the nickname "The Hawk", on information and
belief either Captain Richard Kelly, Shield No.
851 or Captain Robert Kelly, Shield No. 1226);
DOC Corrections Officer RICHARD HILL, Shield No.
17943; DOC JOHN DOE WHO RECEIVED THE
SUPREME COURT'S "CUT SLIP" ORDERING
PLAINTIFF'S RELEASE ON OCTOBER 19, 2007;
JOHN DOES; RICHARD ROES,

                      Defendants.
----------------------------------------------------------------X

      Plaintiff Matthew Perez ("Plaintiff"), by his attorney, Jeffrey A. Rothman, Esq., for this

Complaint, alleges as follows:

**PRELIMINARY STATEMENT**

      1.     Plaintiff Matthew Perez is the victim of a perverse and pervasive practice,

sanctioned at the highest levels of the New York City Department of Correction (the

"Department" or "DOC"), in which correction officers at New York City jails engage inmates to

1

assault other inmates as a way, *inter alia*, to control and discipline those held in custody. This practice has been uncovered and substantiated by investigations of the New York City Department of Investigations and the DOC's Inspector General and has resulted in two indictments in the last year of correction officers who worked in Robert N. Davoren Complex ("RNDC") (formerly named Adolescent Reception and Detention Center ("ARDC")), where Mr. Perez was assaulted. In October 2008 an RNDC inmate died as a result of sanctioned inmate-on-inmate violence. Mr. Perez was, in addition, subjected to other manifest and shocking violations of his rights while in DOC custody, as described in further detail below.

2. The Bronx District Attorney ("DA") has explained that RNDC was run like an organized-crime family, where correction officers, under a system known as "The Program," would give "favored prisoners free reign to beat, rob and extort whomever they please" – to quote the outraged Daily News editorial. RNDC was an "incubator for violent criminal activity sanctioned by adults in positions of authority," according to the DA. The motive for this brutality was, *inter alia*, to make correction officers' jobs easier by having the inmates maintain order among themselves. As RNDC is a facility for male youths (principally housing 16, 17, and 18 year old boys), this officer-sanctioned violence against these boys is particularly pernicious.

3. In a January 29, 2009 editorial, The New York Times described this as a "horror story." The Times demanded that "the entire culture" of RNDC "needs to be changed" and laid the blame squarely on the New York City Department of Corrections for failing to properly train and supervise correction officers.

4. On information and belief, it is also a well-known practice sanctioned at the highest levels within DOC for staff to protect, favor and support Security Risk Group ("SRG")

prisoners, which DOC keeps record of, who belong to the "Bloods" gang. Therefore, any prisoner who is an enemy of the Bloods gang and / or does not submit to the demands of members of the Bloods gang is in physical danger if housed in a facility where SRG Bloods are housed.

5. Though the correction officers' duty was to protect Mr. Perez, they were deliberately indifferent to and / or directly encouraged the dangers posed to him, and permitted other inmates to attempt to extort commissary and property from him, and to beat him. On September 30, 2007 and in October, 2007 Mr. Perez, then 18 years old, was housed for part of his period of detention at Rikers Island at RNDC, which is the adolescent housing area. He fell victim to "The Program" and was beaten by other inmates, including on information and belief by members of the Bloods, on multiple occasions during that brief period of time. A Judge of the New York City Criminal Court directed that Mr. Perez be placed into protective custody after having been so beaten.

6. There have been other claims filed in this Court by other victims of these DOC practices (*see* Douglas v. City of New York, et al, 07 Civ 8443 (GEL), and Shuford v. City of New York, 09 Civ. 945 (PKC))

7. Mr. Perez was assaulted by other inmates whom the defendant DOC personnel had authorized to maintain order. Though the correction officers' duty was to protect Mr. Perez and other inmates, they actually facilitated the beatings and took no steps to protect Mr. Perez. On one occasion, Mr. Perez was struck by defendant DOC Captain Kelly, after he and all of the other prisoners were forced to remove all of their clothing. Mr. Perez was also punished by defendant Corrections Officer Hill for requesting medical treatment after having been so abused.

8. On information and belief, DOC personnel routinely falsify DOC documents to cover up their complicity in beatings of inmates.

**JURISDICTION AND VENUE**

9. This action arises under the Fourteenth Amendment to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

10. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1342(a)(3)-(4) and 1367(a).

11. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

**JURY DEMAND**

12. Plaintiff demands trial by jury in this action.

**PARTIES**

13. Plaintiff Matthew Perez is a citizen and resident of the United States, and at all times relevant herein was a resident of the State of New York , New York County.

14. Defendant City of New York ("City") is a municipal corporation which, through its Department of Corrections, operates a number of detention facilities. The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by uniformed staff and inmates, and access to medical and other program services mandated by local law and court orders, and with regard to the length of detention and release of prisoners in its custody when required by law. In addition, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails,

including these that are inconsistent with formal policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs.  The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

15.     At all times relevant hereto, Martin Horn was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City of New York, within the scope of his employment as such, and acting under color of state law.  On information and belief, defendant Horn, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.  As Commissioner, defendant Horn is also responsible for the care, custody, and control of all inmates housed in the Department's jails.  As Commissioner, Horn was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails.  In addition, at all relevant times, defendant Horn was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the Unites States and of the State of New York.  Defendant Horn is sued in his individual capacity.

16.     At all times relevant hereto, Carolyn Thomas was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of the City of New York, within the scope of her employment as such, and acting under color of state law.  As Chief of Department, she was the highest ranking uniformed member of DOC, and was responsible for the

supervision, oversight, and discipline of the uniformed security staff in all the Department jails. She was also responsible for the care, custody, and control of all inmates in the Department jails. As Chief of Department, Thomas is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Thomas is sued in her individual capacity.

17. At all times relevant hereto, Richard R. White was the Deputy Commissioner of the Department, Investigation Division. As Deputy Commissioner, his responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate, or is alleged to have used force, and recommending Department discipline against staff believed to have violated Department policies and rules including those concerning use of force. Defendant White was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant White is sued in his individual capacity.

18. At all times relevant hereto, defendant Gregory McLaughlin was the Warden of RNDC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, defendant McLaughlin, as Warden of RNDC, was responsible for supervising correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined at RNDC. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols. Defendant McLaughlin is sued in his individual capacity.

19.     At all times relevant hereto, Defendant DOC Captain Kelly (a skin bald African American man known by the nickname "The Hawk", on information and belief either Captain Richard Kelly, Shield No. 851 or Captain Robert Kelly, Shield No. 1226), was a Captain at RNDC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, defendant Kelly, as a Captain of RNDC, was responsible for supervising correction officers with respect to the care, custody, and control of inmates confined at RNDC.  These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols.  Defendant Kelly is sued in his individual capacity.  Defendant Kelly worked at RNDC at the time of the incidents alleged herein, and personally assaulted Mr. Perez.

20.     Defendants Horn, Carolyn Thomas, White, McLaughlin, Captain Kelly, and Richard Roes (as yet unidentified supervisors within DOC) are collectively referred to as the "Supervisory Defendants."

21.     At all times relevant hereto, defendant Richard Hill, Shield No. 17943; DOC John Doe Who Received The Supreme Court's "Cut Slip" Ordering Plaintiff's Release On October 19, 2007; and John Does (as yet unidentified Correction Officers within DOC), were correction officers within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of their employment as such, and acting under color of state law.  Defendant Hill worked at RNDC at the time of the incidents alleged herein, and was a causal factor and / or witnessed and /or failed to intervene in the beatings suffered by Mr. Perez.  On information and belief, DOC John Doe Who Received The Supreme Court's "Cut Slip" Ordering Plaintiff's Release On October 19, 2007

signed the New York County Supreme Court's Part 70 "pen book" upon receipt of the "Change of Status Form / Release from Custody Order" (also known as a Supreme Court "cut slip") on October 19, 2007 and with deliberate indifference did not ensure that it cause Plaintiff's immediate release, thus causing Plaintiff's unlawful detention from October 19, 2007 until October 22, 2007. Defendants Hill; DOC John Doe Who Received The Supreme Court's "Cut Slip" Ordering Plaintiff's Release On October 19, 2007; and John Does are sued in their individual capacities, and are collectively referred to as the "Individual Correction Officer Defendants."

**STATEMENT OF FACTS**

I.     **RIKERS ISLAND: A History of Correction Officers Sanctioning Inmate Fights**

22.     For years, through Department reports, civil litigation, and two criminal indictments, the City and Supervisory Defendants have been aware of the routine, dangerous and unconstitutional sanctioning of inmate-on inmate violence, and staff-on inmate violence, at jail facilities on Rikers Island. In many instances, DOC staff instigated, encouraged or sanctioned the use of inmate enforcers to discipline other inmates. That practice caused Mr. Perez's injuries.

23.     On February 14, 2008, the Bronx District Attorney ("DA") indicted correction officer Lloyd Nicholson of RNDC, for using inmates as enforcers and encouraging inmate-on-inmate violence. The DA charged Officer Nicholson with gang assault, assault, and official misconduct, in connection with a scheme to use teenage inmates to enforce discipline at RNDC. According the DA's press release, the "grand jury charged Nicholson with 'acting in concert' in causing physical injury to two inmates on June 10, 2007 by ordering six other inmates to beat them. One of the two victims sought medical attention and was taken to Elmhurst Hospital for treatment of a collapsed lung. *See* New York City Correction Officer Charged With Gang Assault For Allegedly Ordering Inmates On Rikers Island To Beat Fellow Detainees At the City Jail, at http://bronxda.nyc.gov/information/2008/case9.htm.

24.     This indictment was the result of investigations by the New York City Department of Investigations and the Inspector General for DOC which, according to the DA, "uncovered a systematic program allegedly run by Nicholson, in which he would use a select group of inmates to maintain order and enforce discipline. The group of inmates would enforce

rules of conduct establish by Nicholson in exchange for preferential treatment, which included allowing them to extort commissary and telephone privileges as well as personal property from other inmates. It is alleged that Nicholson benefited by not having to constantly monitor his post during his overnight tour of duty." *Id.*

25. On October 17, 2008, inmate Christopher Robinson died at RNDC, while under the supervision of the DOC, after being beaten by other inmates.

26. The Bronx DA has alleged that Mr. Robinson was "brutally beaten because of his refusal to go along with a violent extortion enterprise against adolescent inmates which was jointly operated by the indicted correction officers and their teenage accomplices."

27. On information and belief, Mr. Robinson did not receive medical attention immediately after being beaten, but instead bled in holding cells for hours.

28. The investigation into Mr. Robinson's death revealed that nine separate officer-sanctioned beatings, of nine separate inmates, had occurred since July 2008 at RNDC.

29. On January 22, 2009 the Bronx DA indicted three RNDC correction officers for conspiracy, enterprise corruption, and/or assault. The DA, in his press release, alleged that correction officers "acting as managers for an organization referred to as 'the Program' at RNDC. *See* The Death of An 18-Year Old Inmate on Rikers Island Last October Leads To Numerous Criminal Charges Against Three Correction Officers and Twelve Teenage Inmates, at http://bronxda.nyc.gov/information/2009/case3.htm.

30. Under "the Program," correction officers "would cede responsibility for maintaining order to inmates known as 'the Team' whom they personally selected." The Team would "maintain order" and , in exchange, the officers authorized the Team to extort property

from other inmates.  "Inmates who refused to go along with the Program were punished by being assaulted" by the Team.  The officers would generally "designate the date, time, location and manner of the "beatdown."

31.     On June 1, 2007, the Bronx DA indicted an Assistant Deputy Warden and a Captain for an egregious cover-up of a staff assault at RNDC in connection with an incident that occurred on October 4, 2006.  The indictment alleged that Captain Sherman Graham struck inmate Brian Mitchell without provocation when he refused to submit to a strip search in the presence of 15 Corrections Officer recruits whom he then ordered to falsely claim that Mitchell had been the aggressor, and that Assistant Deputy Warden Gail Lewis participated in the cover up.  *See*, Assistant Deputy Warden and Correction Department Captain Indicted in Connection With Cover-Up of Assault on a Rikers Island Inmate, at http://bronxda.nyc.gov/information/2007/case27.htm.

32.     RNDC is not the only facility at Rikers where guards sanction inmate-on-inmate violence.  Roger Cullen, a former correction officer at the Anna M. Kross ("AMKC"), a facility on Rikers Island, testified under oath about an inmate-on-inmate assault at AMKC in 2003.  *See Jackson v. City of New York, et al.*, 04 Civ. 5799 (DC).  In his January 2007 deposition, Cullen testified that the inmate assailant had essentially been deputized as an enforcer by correction officers to control the other inmates.  The inmate told the other inmates when to shower, when to lock in, and when to clean their cells. According to Cullen, another correction officer who was off his post at the time the assault occurred, made a false entry in the logbook and then asked Cullen to write a report that claimed that Jackson had slipped and fallen in the shower.  According to Cullen, this practice where correction officers conspired to make false reports on

incidents involving inmates was termed "write with us." Upon information and belief, Cullen complained to the Department about the above instances of corruption, as well as other instances, as early as September 2003.

33. Through DOC's elaborate report system, the City and the Supervisory Defendants were aware of the pattern of a large number of incidents involving inmate-on-inmate violence and have failed to take sufficient steps to curb such beatings.

34. The City and the Supervisory Defendants were also aware, or should have been aware, which staff members were involved in incidents in which inmates were injured by other inmates, yet, notwithstanding that information, they have failed to take sufficient steps to curb such beatings.

35. The City and the Supervisory Defendants were also aware, or should have also been aware of the failure of the Department to bring disciplinary charges against those officers who sanction or ignore inmate-on-inmate violence, punish staff that sanction and/or cover up such violence, and discourage others from doing so.

36. Through all these cases and Department reports, the City and the Supervisory Defendants have been made aware of the widespread practice by DOC staff of sanctioning or encouraging violence against inmates. They have also been made aware of the failures of DOC's Investigation Division to adequately investigate allegations of correction officers' complicity in such beatings (or perpetration of such beatings), a practice that causes further abuse.

II. **Events particular to Plaintiff Matthew Perez from September 30, 2007 to October 22, 2007**

37.     On September 30, 2007, Plaintiff MATTHEW PEREZ was arrested for allegedly violating New York State Penal Law ("PL") § 120.05(2) Assault in the Second Degree.

38.     Bail was set for Mr. Perez, which he was unable to meet.  As a result he was placed into the custody of the NYC DOC and held at Rikers' Island.

39.     As with all pre-trial detainees, Mr. Perez was under our system of law and the requirements of the Constitution presumed to be innocent of any crime, and was entitled to be held in custody in a manner that respected his dignity and took steps to ensure his health and safety.

40.     On the bus when Plaintiff was initially taken to Rikers Island, Plaintiff was struck after another prisoner demanded his PIN number for his commissary.  The other prisoner had asked Plaintiff if he was "with it," and Plaintiff was not "with it."

41.     Once at Rikers Island, Plaintiff was initially housed at "Mob 1 Lower" at RNDC, a dormitory-style detention facility for adolescents.

42.     While Plaintiff was housed at "Mob 1 Lower" at RNDC, defendant Hill walked through the facility and pointed at prisoners in the various beds, stating either "he's with it" or "he's not with it" with regard to the various prisoners.

43.     While at RNDC Plaintiff heard John Doe Corrections Officers say things like, "get with the program" and "get down or lay down."

44.     During Plaintiff's time at "Mob 1 Lower" at RNDC, another prisoner, on information and belief a member of the Bloods gang who ran de facto ran the facility, demanded Plaintiff's PIN number for his commissary.  Plaintiff refused to give up his PIN Number.

45.     Thereafter, while in the shower / bathroom area at "Mob 1 Lower" at RNDC (which was infested with black worms / leeches) Plaintiff was viciously assaulted by multiple other

prisoners in the shower / bathroom area after that Bloods gang member who ran de facto ran the facility pointed at Plaintiff and stated "turn it up."

46. A John Doe Corrections Officer saw Plaintiff being beaten and did nothing to intervene to stop it from occurring.

47. That night a "search team" was dispatched to "Mob 1 Lower" at RNDC. All of the prisoners, including the Plaintiff, were forced to take off all of their clothes, and get against the wall. Female Corrections Officers walked around and made fun of some of the naked adolescent male prisoners, saying things like "look at his little dick" with regard to some of the prisoners.

48. The prisoners were then forced to line up in rows going into the bathroom, and defendant Captain Kelly proceeded to hit the prisoners in the heads with a commissary bin lid. Some prisoners who were deemed to have an attitude were ordered into the shower / bathroom area.

49. Plaintiff was ordered into the shower / bathroom area. In the shower / bathroom area defendant Captain Kelly proceeded to punch Plaintiff with great force in the ribs and called and told him things like "little bitch," and "get out little pussy."

50. When Plaintiff, subsequent to being assaulted and battered by defendant Captain Kelly, asked to go to the hospital / infirmary, he was punished by having his identification taken from him by defendant Corrections Officer Hill. Another Correction Officer arranged thereafter for Plaintiff to go to the hospital / infirmary.

51. Plaintiff was beaten on yet another occasion by other prisoners in the bathroom area when he refused to relinquish his shoes to another prisoner who was demanding them.

52. On yet another occasion while Plaintiff was housed at "Mob 1 Lower" at RNDC, at the school area, a prisoner who was a Security Risk Group ("SRG") prisoner, on information and

belief a member of the Bloods, asked Plaintiff if Plaintiff was "bangin'"" (i.e., was a member of a gang). When Plaintiff said no, this SRG prisoner told Plaintiff that Plaintiff had to "get with it" and demanded Plaintiff's shoes. Plaintiff refused to relinquish his shoes to this SRG prisoner and informed this SRG prisoner that he was not "with it", and was attacked by this SRG prisoner while at the school area.

53. Plaintiff on another occasion saw this SRG prisoner joking with John Doe Corrections Officer defendants.

54. Plaintiff was constantly in danger while he was housed at "Mob 1 Lower" at RNDC, and the beatings he sustained occurred routinely while he was housed there.

55. At one of Plaintiff's Court appearances, a Criminal Court Judge directed that Plaintiff be placed in protective custody due to the attacks upon him.

56. At some point thereafter, the DOC then unlawfully and improperly put Plaintiff into a cell for 23 hours a day in a facility called 3 North.

57. Plaintiff was then subsequently moved to a facility called 3 Lower.

58. On October 19, 2007, at Part 70 of the New York County Supreme Court, the Honorable Justice Laura Ward of the New York County Supreme Court ordered the Plaintiff to be released immediately from custody after a grand jury voted a "no true bill", and dismissed the charge for alleged violation of Penal Law §120.25(2), Assault in the Second Degree, on the application of the New York County District Attorney's Office.

59. Instead of releasing him from custody forthwith in compliance with the Judge Ward's Order, defendant John Doe and Richard Roe employees, servants, and/or agents of the DOC continued to detain Plaintiff at Rikers Island until October 22, 2007.

60.     On information and belief, DOC John Doe Who Received The Supreme Court's "Cut Slip" Ordering Plaintiff's Release On October 19, 2007 signed the New York County Supreme Court's Part 70 "pen book" upon receipt of the "Change of Status Form / Release from Custody Order" (a Supreme Court "cut slip") on October 19, 2007, and intentionally, knowingly and/or with deliberate indifference did not ensure that Plaintiff be immediately released, thus causing Plaintiff's unlawful detention until October 22, 2007.

### CLAIM FOR RELIEF
### 42 U.S.C. § 1983/ Fourteen Amendment
**(Against the City of New York, Supervisory Defendants, and Individual Correction Officer Defendants)**

61.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

62.     By reason of the foregoing, and by conspiring together, assaulting and battering and failing to intervene to prevent such assault and battery, and by sanctioning, encouraging, and failing to prevent and failing to intervene to prevent inmate assailants from assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, and by failing to release Plaintiff from DOC custody on October 19, 2007 as per the order of the court, and by forcing Plaintiff to remove all of his clothes and subjecting Plaintiff to further degrading and abusive treatment and unlawful, filthy, and cruel conditions of confinement, the Supervisory and Individual Correction Officer Defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force, unlawful deprivation of

liberty, degrading and abusive treatment, and unlawful, filthy, and cruel conditions of confinement.

63.     The Supervisory and Individual Correction Officer Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees.  These defendants acted willfully, knowingly, and /or with deliberate indifference, and deprived plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

64.     The Supervisory Defendants knew and/or should have known that the pattern of sanctioned inmate-on-inmate assaults, and assaults by DOC personnel, described above existed in the City jails prior to and including the time of the assaults on Plaintiff.  Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of his subordinates.  The prevalence of these practices and general knowledge of their existence at the time of plaintiff's beatings, and the failure of defendants to take appropriate remedial action despite the fact that the use of inmate enforcers, and abuse of inmates by subordinate DOC personnel, had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including the inmate named as a plaintiff in this action.  By failing to remedy the wrongs committed by their subordinates, and in failing to properly train, screen, supervise, or discipline their subordinates, the Supervisory Defendants caused damage and injury in violation of plaintiffs' rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its Fourteenth amendment.  These defendants' conduct had been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in

this complaint.

65. Defendant City, through DOC, and acting under the pretense and color or law, has permitted, tolerated and been deliberately indifferent to a pattern and practice of sanctioned inmate-on-inmate assaults, and assaults by DOC personnel upon inmates. This widespread tolerance of correction officers' and other DOC personnel's sanction of inmate assaults, and of assaults by DOC personnel themselves, constitutes a municipal policy, practice or custom and led to plaintiff's assaults. At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its Department of Corrections, and through the individual defendants, had de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline employees, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said defendants. These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

66. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which plaintiff was subjected to beatings and wrongfully deprived of his liberty and dignity while in DOC custody between September 30, 2007 and October 22, 2007, defendant City has deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force, unlawful deprivation of liberty, and cruel and inhumane treatment.

67. As a direct and proximate result of the above misconduct, abuse of authority, and conspiracy with regard to the same, and the policy, practice and custom detailed above, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, and was otherwise damaged and injured.

WHEREFORE, Plaintiff demands the following relief jointly and severally against all of the defendants:

    a. Compensatory damages;

    b. Punitive damages;

    c. The convening and empanelling of a jury to consider the merits of the claims herein;

    d. Costs and interest and attorney's fees;

    e. Such other and further relief as this court may deem appropriate and equitable.

Dated:    New York, New York
            March 9, 2009

                                      _____/S/_____
                                      JEFFREY A. ROTHMAN, Esq.
                                      (JR-0398)
                                      315 Broadway, Suite 200
                                      New York, New York 10007
                                      (212) 227-2980
                                      Attorney for Plaintiff